**Mark H. HUDSON, Appellant,**

v.

**THURSTON MOTOR LINES, INC., Appellee.**

Supreme Court of Tennessee.

June 25, 1979.

Samuel L. Swann, Springfield, for appellant.

Luther E. Cantrell, Jr., Smith, Davies, Smith & Cantrell, Nashville, for appellee.

## OPINION

FONES, Justice.

This is an appeal from the trial court's denial of workmen's compensation benefits to plaintiff Mark H. Hudson, a twenty-three year old truck driver employed by defendant Thurston Motor Lines. The trial court found that Hudson was within the course of his employment at the time of his injury and that he suffered a ninety-two and one-half percent permanent partial disability. The only issue raised on appeal is whether the trial court was correct in holding that Hudson's injury did not arise out of his employment. We reverse.

The material facts upon which that issue revolves were undisputed. Hudson worked as a truck driver, delivering freight for Thurston in the City of Nashville. His employer's records revealed that on the date of the accident, July 1, 1977, at approximately 9:00 a. m. he delivered a trailer load to Paschall Truck Lines and "bobtailed" back to the Thurston terminal. At 10:45 a. m. he was dispatched to Werthan Bag with a cargo consisting of eight rolls of paper. According to Richard Graham, a dispatcher for Thurston Motor Lines, Hudson was advised before he left that after the paper was unloaded at Werthan he would pick up other cargo to be returned to the Thurston terminal. Werthan was located on Eighth Avenue, six or seven miles across town from the Thurston terminal. Graham, testifying with the record of Werthan's calls before him, said that the return cargo was scheduled for pick up at 1:00 p. m. at the request of Werthan. According to Graham and the employer's records, Hudson called in from Werthan at 11:45 a. m., following standard instructions and practice, and Graham told him to "get his lunch and be back at Werthan by 1:00 because the appointment was at 1:00." Hudson's version of that telephone conversation was that he was instructed to "go get something to eat and bring it back and eat while they loaded, where I wouldn't be gone so long, instead of driving all the way across town back to Thurston." Hudson also said that but for the later scheduled loading at Werthan, he would have returned to Thurston and had lunch in the "break room" or at a nearby restaurant on Foster Avenue.

It was undisputed that although the Thurston city drivers could eat when and where they might select, it was expected that they would take into consideration the convenience of the employer and its customers, as well as their own, in selecting the time and place for lunch. Further, it was undisputed that if less than one hour was taken for lunch, the drivers were paid for the difference between the time actually taken and one hour. Parenthetically, we do

not regard the discrepancy between Graham's and Hudson's versions of the instructions about lunch as material. It is clear that Hudson's selection of the Kentucky Fried Chicken place a few blocks down Eighth Avenue from Werthan, was for the mutual convenience and economy of the employer, its customer, and perhaps himself.

It was a tragic choice. Hudson drove the tractor-trailer to the Kentucky Fried Chicken establishment located at Eighth Avenue and Jefferson Street, obtained an order to go, and while entering the truck's cab, he was shot by two or three assailants, permanently paralyzing him from the waist down. The motivation for the assault is unknown. Hudson was carrying $195.00 in cash on his person that was not taken, nor was anything taken from the employer's tractor-trailer.

### I.

Many cases have reached this Court concerning the statutory requirement that a compensable injury arise out of the course of employment. It is well established under our law, as expressed by the Court in *Travelers Ins. Co. v. Googe,* 217 Tenn. 272, 279, 397 S.W.2d 368, 371 (1965):

> "The phrase, 'in the course of' refers to time and place, and 'arising out of', to cause or origin; and an injury by accident to an employee is 'in the course of' employment if it occurred while he was performing a duty he was employed to do; and it is an injury 'arising out of' employment if caused by a hazard incident to such employment. *Shubert v. Steelman,* 214 Tenn. 102, 377 S.W.2d 940 (1964)."

The employer insists that the fact that Hudson was on his lunch break, during which time he was neither under the control nor direction of his employer, precludes an award of benefits as a matter of law. The question of whether lunch-time injuries are compensable involves whether the injury met the course of employment requirement, i. e., a consideration of "time, place and circumstances" factors. *See Hendrix v. Franklin State Bank,* 154 Tenn. 287, 290

S.W. 30 (1926). Injuries that occur while an employee is furthering or facilitating his employer's business are incurred in the course of his employment. *See* 1 Larson, Workmen's Compensation Law §§ 14, 15.50 (1978). Generally, injuries received during a lunch or dinner break and while the employee is off the premises are not compensable under our Workmen's Compensation Law. *See, e. g., Greenfield v. Manufacturers Cas. Co.,* 198 Tenn. 452, 281 S.W.2d 47 (1955). It is obvious that the "premises rule" cannot be applied to the factual situation present here. As stated heretofore, Hudson was at a place selected for the convenience of his employer and its customer and his activities, at the time of his injury, were furthering and facilitating his employer's business. We find that the record substantiates the trial court's findings that Hudson's injury occurred in the course of his employment.

### II.

The issue of whether the accident arose out of the employment is a more difficult question. The standards that this Court has adhered to, throughout the history of workmen's compensation litigation, although expressed in widely-varying language, center upon a showing of (1) a causal connection between the employment and the injury or (2) a risk incidental to or peculiar to the employment. Coverage has sometimes been rejected on the grounds that the risk or danger that caused the accident and injury was an exposure common to the public. In fact, the trial judge's order denying compensation in this case was predicated upon the statement that "[p]laintiff was exposed only to the risks common to all members of the community in going to eat lunch." Professor Larson classifies the standards noted above as the "peculiar risk test." He summarizes the trend of acceptability of that test as follows:

> "Most courts in the past have interpreted 'arising out of employment' to require a showing that the injury was caused by an increased risk to which claimant, as dis-

tinct from the general public, was subjected by his employment. A substantial number have now modified this to accept a showing merely that the risk, even if common to the public, was actually a risk of this employment. An important and growing group of jurisdictions has adopted the positional-risk test, under which an injury is compensable if it would not have happened but for the fact that the conditions or obligations of the employment put claimant in the position where he was injured.

The peculiar-risk test, requiring that the source of harm be in its nature (as distinguished from its quantity) peculiar to the occupation, and the proximate-cause test, requiring foreseeability and absence of intervening cause, are now largely obsolete." Larson, *supra* § 6.00.

We think it may be an oversimplification to classify various jurisdictions as following the peculiar-risk, the positional-risk or the actual-risk test, etc. In any event, the result we reach in this case is not to be construed as an adoption of the positional-risk test, or an abandonment of the peculiar-risk test.

Nevertheless, the standards employed by this Court in deciding whether accidents arise out of employment have led to diverse results.

In *Carmichael v. J. C. Mahan Motor Co.*, 157 Tenn. 613, 11 S.W.2d 672 (1928), the trial judge sustained a demurrer to plaintiff's declaration seeking workmen's compensation for an injury sustained when a ten year old boy shot him in the eye with an air rifle. The boy's father had brought his vehicle to the employer's garage for repairs, accompanied by his son and two other minors. The boys were playing about the premises and employee was sweeping out the showroom when the shooting occurred.

The Court held that the injury was the result of conditions inseparably connected with the public service given by the petitioner's employer to his patrons and that the injury could be fairly traced to the employment as the contributing proximate cause.

In *Scott v. Shinn,* 171 Tenn. 478, 105 S.W.2d 103 (1937), Scott was a driver-salesman of Nehi Bottling Company and was servicing a customer of his employer when he was shot and killed by an armed assailant, who may or may not have intended to rob a dog wagon lunchroom. It was stipulated that Scott was shot while in the course of his employment. The Court held that the accident did not arise out of the employment.

In response to the argument that Scott's employment caused him to be in that place of danger, the Court said it was not enough that the accident would not have happened if he had not been in that place but that it must have resulted from something he was doing in the course of his work or from some peculiar danger to which the work exposed him. The Court concluded that "walking in on a hold-up cannot be said to have been a peculiar danger to which his work exposed him" and therefore no causal connection was found between Scott's employment and his injury. 171 Tenn. at 484, 105 S.W.2d at 105.

Two years after *Scott v. Shinn, supra,* this Court concluded that a travelling man's death in a hotel fire of unknown origin arose out of his employment. *Carter v. Hodges,* 175 Tenn. 96, 132 S.W.2d 211 (1939). Mr. Justice Dehaven wrote both opinions. Hodges was a travelling salesman for Carter Candy Company, spending the night in a hotel in Atlanta, that was directly on the regular route usually followed in covering his assigned territory. Hodges perished in the fire of unspecified origin that destroyed the hotel in the early morning hours. The Court found that Hodges was in the course of his employment from the fact that he was on the regular route of his employer in going through Atlanta. The Court said that "deceased met his death in an accident growing out of his employment." 175 Tenn. at 103, 132 S.W.2d at 214. That conclusion was reached without specific reference to any of the principles cited in *Scott.* The Court apparently relied for authority upon a quotation from *Whiting-Mead Commercial Co.*

*v. Industrial Accident Comm'n.,* 178 Cal. 505, 173 P. 1105 (1918). The gist of the quotation from the California court's opinion was that a travelling salesman on his employer's business must eat and sleep and put up at hotels and boarding houses and otherwise "minister[s] unto himself;" that those acts contribute to the furtherance of his work, are inevitable incidents and such dangers as attend them and produce accidental injuries arise out of the employment. 175 Tenn. at 103–04, 132 S.W.2d at 214.

In *Whaley v. Patent Button Co.,* 184 Tenn. 700, 202 S.W.2d 649 (1947), an ex-employee appeared at the button factory nine days after he had quit or was discharged and shot three or four employees through a window with a .22 rifle. Plaintiff and the other employees that were shot were working on button molding machines similar to the one formerly operated by the ex-employee. The Court held that this fact was sufficient to provide a causal connection between the conditions under which the work was performed and the resulting injury and was therefore compensable.

In *Thornton v. R. C. A. Service Co.,* 188 Tenn. 644, 221 S.W.2d 954 (1949), an employee whose, job necessitated travel from one job town to another job town, was shot while eating at a restaurant along his route during a lunch period, by a stranger who was insane, drunk, or otherwise irresponsible. The Court observed that Thornton would not have been in that particular restaurant on that occasion if he had not been travelling on the business of his employer, but that being in the course of his employment was not sufficient for recovery, as the injury must have arisen out of the employment. The Court distinguished the facts in *Thornton* from cases such as *Whaley,* wherein it had allowed recovery on the finding of a causal connection between employment and the assault. Relying principally on *Scott v. Shinn, supra,* the Court denied compensation.

In *Jackson v. Clark & Fay, Inc.,* 197 Tenn. 135, 270 S.W.2d 389 (1954), the Court, with two members dissenting, denied compensation. The employee was riding in the employer's truck at the end of the day's work to employer's furnished sleeping quarters when a storm struck the truck and Jackson was killed. The Court said compensation depended upon two questions, whether the causative danger was peculiar to Jackson's work and not common to the neighborhood, and whether such an injury could reasonably have been contemplated as a risk incident to Jackson's duties.

The Court cited a number of "borderline decisions" which were said to, nevertheless, have the common thread of an injury arising from a foreseeable risk incident to the employment. *Whaley* was cited and then excluded from that characterization and singled out as being predicated upon a causal-connection between the injury and the employee's operation of a machine that the discharged aggressor had formerly operated, "which seemed to satisfy [the Court]." 197 Tenn. at 138, 270 S.W.2d at 390. *Carmichael* was also one of the borderline cases cited as a foreseeable risk case, but was not singled out for comment, which seems to indicate that the *Jackson* Court felt that *Whaley* rested on more precarious ground than *Carmichael.*

The majority opinion made these interesting comments about *Carter v. Hodges, supra :*

"It was held to be a compensable injury on the ground that the danger of being injured by the hotel burning is a danger incident to staying in a hotel at night. No reasoning is necessary to sustain the statement that the burning of the hotel is a foreseeable hazard. The rigid laws aimed at prevention of fires in hotels, and laws with reference to fire escapes therein, and other such laws, conclusively illustrate that the hazard of fire in a hotel is generally recognized. Thus it was a foreseeable hazard incident to the employment; therefore, compensable." 197 Tenn. at 139, 270 S.W.2d at 391.

With that new light shed upon *Hodges,* it would appear that the instant case falls squarely within its scope. Assaults and shootings and armed robberies are as much a danger in the 1970's as a hotel fire, occur

with far greater frequency, and have laws aimed at their prevention, so we are justified in reaching the same conclusion, to wit, that what happened to Hudson at Eighth and Jefferson in Nashville, Tennessee, was a foreseeable hazard incident to the employment of a truck driver of a motor freight line.

■ In our leading assault cases, this Court appears to have focused upon the motive of the assailant and disregarded any risk that may have been incidental to the employment environment. We think the correct resolution of this case involves a consideration of the risks and dangers inherent in a truck driver's employment, rather than the objective of the assailants. No one can quarrel with the conclusion that a truck driver for a motor freight carrier is exposed to the hazards of the streets and highways to a substantially greater extent than is common to the public. That is the basis for the street-risk rule, which simply stated, is that the risks of the street are the risks of the employment, if the employment requires the employee's use of the street. *See* Larson, *supra,* § 9.40. As might be expected, the Courts differ as to the degree of exposure, in excess of that of the general public, required to invoke the doctrine, but a truck driver for a motor freight line is within the scope of the street-risk doctrine under the most restrictive test.

Two Tennessee cases, *Central Surety & Ins. Corp. v. Court,* 162 Tenn. 477, 36 S.W.2d 907 (1931) and *Crane Rental Service v. Rutledge,* 219 Tenn. 433, 410 S.W.2d 418 (1966), are cited by Professor Larson as being among the many courts that have announced the street-risk rule. We think it is doubtful that this Court had any recognition that it was adopting that rule in the cases cited, but they are nevertheless subject to the interpretation that the Court sanctioned the principle that if the employment exposes the employee to the hazards of the street that it is a risk or danger incident to and inherent in the employment and provides the necessary causal connection between the employment and the injury.

■ The street risk doctrine is not limited to accidents between vehicles on the streets and highways. *See Katz v. A. Kadans & Co.,* 232 N.Y. 420, 134 N.E. 330 (1922). It includes assaults and highway robbery. Professer Larson cites the leading cases so holding, in the course of making these comments:

"The street-risk doctrine as applied to assaults is another common application of the general rule granting compensation when the assault arises out of a risk associated with the situs of the work. And just as the majority of street-risk cases now are based on the actual-risk rather than the increased-risk test, so the same broad standard is applied to assaults upon those whose work takes them upon the highway.[34] Highway robbery is per-

[34] *State Compensation Ins. Fund v. Industrial Comm'n,* 80 Colo. 130, 249 P. 653 (1926):
  'Robbers have always been and are an ordinary risk of the road—a risk, it is true, that all travelers, whether employed like this man or not must run—yet this man's employment was to go and come; it was then a part of his work, and death arose out of it.' 249 P. at 655.

haps the most common fact situation to which this rule is applied, since, as one court pointed out, 'its name indicates that it is a danger incident to, connected with, and "arising out of" the use of highways.'[35] Note that in these cases the

[35] *Beem v. H. D. Lee Mercantile Co.,* 337 Mo. 114, 85 S.W.2d 441, 110 A.L.R. 1044 (1935).

exposure to the risk on the highway is in itself enough to establish the causal connection; there need be no evidence of carrying the employer's money or of protecting his property.[36]

[36] *Beem v. H. D. Lee Mercantile Co.,* N. 35 immediately *supra.*" Larson, *supra* § 11.11(c).

■ Employer emphasized upon the trial of this case and in argument to the trial judge that as Hudson entered the cab of the tractor he felt a gun on his neck, turned around, and before any words were exchanged he was shot several times; that Hudson did not know any of his assailants and presumably they did not know him and that they did not take any money from him. In the course of proving that nothing was

stolen from the tractor-trailer the employer proved that while the tractor had an antenna for a CB radio, the company did not furnish a radio, that being the prerogative of the individual driver and that Hudson did not have a CB radio. In fact there was no proof that there was anything of value in or on the tractor-trailer that could have been taken by the robbers and the implication is that there was nothing to steal except the tractor-trailer itself.

Counsel for the employer stated in argument to the trial court that if Hudson had in fact been trying to protect the property of Thurston Motor Lines, "I think that possibly Your Honor would have something on which to base it," presumably an award of compensation. As we said heretofore, we do not think that knowledge of the motivation behind the senseless attack upon Hudson or whether the object was personal theft or employer theft provides the proper basis upon which to determine compensability. But, if such is conceived to be essential to justify an award in this case, we believe there was sufficient nexus between the assault and Hudson's employment. It is beyond question that the one thing that distinguished Hudson from other members of the general public that were in and around the Kentucky Fried Chicken establishment was the fact that he was the driver of the Thurston Motor Lines tractor-trailer that had a CB antenna, and presented the potentiality, to the assailants, of worthwhile loot for theft of the vehicle which was the responsibility of Hudson. He was charged with responsibility for this valuable equipment, during his lunch hour as well as during working hours. He had been instructed to return to Werthan to have it reloaded at a different dock or area from that where it was unloaded. His assailants selected the moment he was attempting to enter the cab and return to Werthan as the favorable opportunity to make their move, and this combination of circumstances produced the tragic result of gunshot wounds to Hudson. We think these circumstances provide a rational connection with the employment analogous to that found to exist in *Carmichael* and *Whaley*. That circumstance also distinguishes this case from *Scott* and *Thornton*. In each of those cases there was nothing to identify the employee with his employment, at the time and place of the assault. Further, both occurred inside eating establishments, removing them from the scope of the street-risk doctrine.

The judgment of the trial court denying compensation is reversed, and this cause is remanded to the Circuit Court of Davidson County, Tennessee for the entry of a judgment awarding the compensation benefits found by the trial judge to be due if the accident were covered, and for such other proceedings as may be necessary and appropriate. Costs are adjudged against Thurston Motor Lines, Inc.

HENRY, C. J., and COOPER, BROCK and HARBISON, JJ.